**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRIS CORREIA, derivatively on behalf of FITBIT, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>JAMES PARK, WILLIAM ZERELLA, ERIC N. FRIEDMAN, JONATHAN D. CALLAGHAN, STEVEN MURRAY, and CHRISTOPHER PAISLEY,<br><br>    Defendants,<br><br>    and<br><br>FITBIT, INC.,<br><br>    Nominal Defendant. | C.A. No.<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Chris Correia ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Fitbit, Inc. ("Fitbit" or the "Company"), files this Shareholder Derivative Complaint against Defendants James Park, William Zerella, Eric N. Friedman, Jonathan D. Callaghan, Steven Murray, and Christopher Paisley (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Fitbit, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other

things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fitbit, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fitbit's directors and officers who breached their fiduciary duties starting from when the Company had an initial public offering, in June 2015, and continuing through the present (the "Relevant Period").

2.      Fitbit manufactures and provides wearable connected health and fitness trackers worldwide. Since it was founded in 2007, Fitbit has released a variety of wrist-based activity trackers that it claims will help users to achieve their health and fitness goals. Fitbit trackers' features have included, among other things, tracking steps taken, calories burned, distance traveled, active minutes, and sleep duration and quality.

3.      In October 27, 2014, Fitbit introduced its new proprietary heart rate tracking technology called "PurePulse." According to the Company, this technology tracks heart rate "automatically and continuously, without any button-pushing and without an uncomfortable chest strap." Since then, the Company has equipped three trackers with this technology, which are "Fitbit Charge HR," "Fitbit Surge," and "Fitbit Blaze" (the "PurePulse Trackers").

4.      Since the release of PurePulse trackers, the PurePulse technology and the heart rate tracking feature became the centerpiece of Fitbit's promotional efforts. To emphasize the

2

benefits of PurePulse, Fitbit used widely-circulated slogans like: "Know Your Heart," "Every Beat Counts," "Get the Benefits of Continuous Heart Rate," and "For Better Fitness, Start with Heart."

5.      Notably, while Fitbit targeted trackers without heart monitoring features towards consumers looking to track "everyday activity," such as walking and sleeping, it marketed Charge HR and Surge as designed for "more active users" and "performance users."

6.      Individual Defendants caused the Company to repeatedly claim that the PurePulse Trackers could consistently record accurate heart rates even during high intensity activities. In numerous marketing materials, under the direction and under the watch of the Individual Defendants, Fitbit has depicted users wearing the PurePulse Trackers while engaging in strenuous activities, such as jumping rope, boxing, jogging, running, and doing sit-ups and squats. In reality, the Individual Defendants were aware at all times during the Relevant Period that these PurePulse Trackers were defectively designed and were not able to accurately and consistently track heart rate, particularly during moderate to high intensity activities.

7.      On June 2015, Individual Defendants caused the Company to conduct an initial public offering of securities (the "IPO") based on materially false and misleading statements they disseminated and/or caused the Company to disseminate to the investing public, which enabled the Company together with selling shareholders, including certain of the Individual Defendants, to receive $841.2 million in gross proceeds. Only four months later, Individual Defendants caused the Company to launch a follow-on offering (the "Secondary Offering"), in which almost all Individual Defendants participated as a result of an early release from the lock-up restrictions entered in connection with the IPO.

8.      While Fitbit's stock price was artificially inflated due to Individual Defendants' false statements and material omissions, certain of the Individual Defendants, who comprised a majority of the Board, engaged in lucrative insider sales on material non-public information, reaping more than $387 million in proceeds.

9.      The truth began to emerge on January 5, 2016 when a consumer class action was filed against Fitbit in the United States District Court for the Northern District of California, alleging that the PurePulse heart rate monitoring technology in the Fitbit Charge HR and Fitbit Surge failed to consistently and accurately record users' heart rates and posed serious health risks to users. In only two days following the filing of the consumer action, and with the influence of subsequent media reporting, the Company's stock value suffered a loss of 34.6%. On February 16, 2016, another consumer class action was filed against the Company in the United States District Court for the Northern District of California and was consolidated with the first filed consumer class action ("Consolidated Consumer Class Action"). On May 19, 2016, the consolidated plaintiffs filed an amended consolidated complaint, which contained the results of the most thorough and comprehensive study of the PurePulse Trackers performed to date. According to the study, the PurePulse Trackers mis-recorded heart rate by an average of 19.2 beats per minute ("bpm") during moderate to high intensity exercise. If taken into consideration the instances in which the Fitbit devices recorded no heart rate at all, this discrepancy could go up to 24.23 bpm. Based on the research result, the researchers concluded that "the PurePulse Trackers do not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate."

10.     As a result of the false and misleading statements Individual Defendants caused Fitbit to make concerning the accuracy of Fitbit's heart rate tracking, Fitbit securities were

offered and traded at inflated prices. After the truth was exposed, which continued through May 19, 2016, the Company's stock value dropped 54.8%.

11.     Consequently, the Company and all the Individual Defendants also became subject to a federal securities class action and two state securities class actions (collectively, "Securities Class Actions"). On October 26, 2016, the court in the federal securities class action denied the securities defendants' motions to dismiss and sustained all the allegations made by the plaintiffs. Particularly, the court found that the plaintiffs in the federal securities class action "have sufficiently alleged a material misrepresentation or omission by the defendant" both before the IPO, after the IPO, and in the IPO Prospectus. The court also found that the federal securities action plaintiffs established a strong inference of scienter as to the Company defendants.

12.     On December 23, 2016, Fitbit defendants in the federal securities class action filed a motion for partial reconsideration of the court's October 26 order, arguing that the plaintiffs had failed to sufficiently allege the element of scienter as required to state a claim under Section 10(b) of the Exchange Act. On January 19, 2017, the court entered an order denying Fitbit defendants' motion for partial reconsideration and confirmed its ruling that the plaintiffs in the federal securities class action "have sufficiently alleged the necessary elements to proceed on their claims under the Exchange Act."

13.     On January 26, 2017, Fitbit's Board of Directors approved a reorganization, including the termination of 6% of the Company's global workforce, 110 employees, which the Company stated it anticipated would cost it $4.0 million.

14.     During the Relevant Period, in breach of their fiduciary duties owed to Fitbit, the Individual Defendants willfully or recklessly caused the Company to be the subject of various litigations by causing the Company to deceptively market the PurePulse Trackers, to conceal

material information concerning the accuracy of its heart rate tracking technology from the consumers and the general public, and to fail to take any actions to halt the marketing, sale, and distribution of the defective products, and thus exposed unknowing users to health risks.

15.     In breach of their fiduciary duties owed to Fitbit, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose that under the Individual Defendants' direction and on their watch: (i) Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were particularly inaccurate during moderate to high intensity activities; (ii) the heart rate error for PurePulse Trackers could be so great that it posed serious health risks to users; and (iii) a significant portion of Fitbit's revenue was derived from the Company's deceptive marketing and sale of PurePulse Trackers.

16.     In further breach of their fiduciary duties owed to Fitbit, the Individual Defendants caused the Company to request an early release from lock-up agreements exclusively for the benefit of its employees and consultants, which enabled many of them to engage in lucrative insider sales and to receive benefits that were not equally shared by non-insider shareholders.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have incurred substantial damages to the Company, which include (but are not limited to) damages arising from the Consolidated Consumer Class Action, the Securities Class Actions, and the need to undertake internal investigations. Other losses caused to the Company by the Individual Defendants include, but are not limited to, losses from the waste of corporate assets, losses suffered because of the reputational injury and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. The Company has already

6

incurred millions of dollars in connection with these matters and will continue to incur significant losses going forward.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Actions and of their not being disinterested and/or independent directors, a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this district because a portion of the transactions and wrongs complained of herein, including the Defendants' participation in the wrongful acts detailed herein, have occurred in this district. In addition, the Defendants have conducted substantial

business in this district, and have derived substantial compensation from their activities in this district.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of Fitbit common stock. Plaintiff has continuously held Fitbit common stock since the beginning of the Relevant Period.

**Nominal Defendant Fitbit**

24.     Nominal Defendant Fitbit is a Delaware corporation with its principal executive offices located at 405 Howard Street, San Francisco, CA 94105.

25.     Fitbit stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FIT."

**Defendant Park**

26.     Defendant James Park ("Park") has served as a director since March 2007, as Chairman of the Board since May 2015, and as President and Chief Executive Officer since September 2007.  According to the Company's Schedule 14A on Form DEF 14A filed with the SEC on April 13, 2016 (the "2016 Proxy"), as of March 31, 2016, Defendant Park beneficially owned 17,678,101 shares of the Company's Class B common stock, which was 26.9% of the Company's issued and outstanding Class B common stock and represented 21.8% of the total voting power.

27.     For the fiscal year 2014, Defendant Park received $7,835,088 in compensation from the Company. This included $222,179 in salary and $7,612,909 in stock and other compensation. For the fiscal year 2015, Defendant Park received $1,905,840 in compensation

from the Company. This included $525,840 in salary and $1,380,000 in stock and other compensation.

28.     The Company's 2016 Proxy stated the following about Defendant Park:

James Park is our co-founder and has served as a member of our board of directors since March 2007, as our Chairman since May 2015, and as our President and Chief Executive Officer since September 2007. Previously, Mr. Park served as a Director of Product Development at CNET Networks, Inc., an online media company. Prior to CNET Networks, Mr. Park served as the President and a co-founder of Wind-Up Labs, Inc., an online photo sharing company acquired by CNET Networks in April 2005. He was also Chief Technology Officer and a co-founder of Epesi Technologies, Inc., a software company. Mr. Park attended Harvard College where he studied computer science. Mr. Park was selected to serve as a member of our board of directors due to the perspective and experience he brings as our co-founder, President, and Chief Executive Officer.

29.     During the period of time when the Company engaged in wrongdoing to keep the stock price inflated, and before the scheme was exposed, Defendant Park made the following sales of Company stock.  On June 23, 2015, as part of the IPO, Defendant Park sold 1,095,817 shares of Company stock for $18.80 per share, for which he received proceeds of $20,601,359. On November 18, 2015, as part of the Secondary Offering, Defendant Park sold 2,226,980 shares of Company stock for $28.13 per share, for which he received proceeds of $62,644,947. Thus, in total, before the fraud was exposed, Defendant Park sold 3,322,797 Company shares on inside information, for which he received over $83 million.

30.     Upon information and belief, Defendant Park was only able to participate in the Secondary Offering and make the November 18 sales because the lock-up restrictions in connection with the IPO were released prior to the expiration date. Defendant Park's insider sales made with knowledge of material non-public information before the scheme was exposed, including sales made after the suspicious waiver of the lock-up agreements, demonstrate his motive in facilitating and participating in the wrongdoing.

**Defendant Zerella**

31.     Defendant William Zerella ("Zerella") has served as the Company's Chief Financial Officer since June 2014.  According to the 2016 Proxy, as of March 31, 2016, Defendant Zerella beneficially owned 43,605 shares of the Company's Class A common stock and 776,369 shares of the Company's Class B common stock, which was 1.2% of the Company's issued and outstanding Class B common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 31, 2016 was $15.15, Zerella beneficially owned $660,616 worth of Fitbit Class A stock.

32.     For the fiscal year 2014, Defendant Zerella received $4,984,467 in compensation from the Company. This included $169,423 in salary and $4,815,044 in stock and other compensation. For the fiscal year 2015, Defendant Zerella received $877,842 in compensation from the Company. This included $340,423 in salary and $537,419 in stock and other compensation.

33.     The 2016 Proxy stated the following about Defendant Zerella:

William Zerella has served as our Chief Financial Officer since June 2014. From October 2011 to June 2014, Mr. Zerella served as Chief Financial Officer of Vocera Communications, Inc., a publicly held wireless healthcare communications company. Prior to Vocera, from July 2006 to September 2011, Mr. Zerella served as Chief Financial Officer for Force10 Networks Inc., a networking company acquired by Dell Inc. Prior to Force10, Mr. Zerella served as Chief Financial Officer at Infinera Corporation, a telecom equipment provider, and Chief Financial Officer at Calient Networks, Inc., an optical equipment provider. Mr. Zerella has also held various other senior level financial and business management positions at several companies, including GTECH Corporation and Deloitte & Touche LLP. Mr. Zerella holds a B.S. in accounting from the New York Institute of Technology and an M.B.A. from the Leonard N. Stern School of Business at New York University.

38.     During the period of time when the Company engaged in wrongdoing to keep the stock price inflated, and before the scheme was exposed, Defendant Zerella made the following

sales of Company stock. On November 18, 2015, as part of the Secondary Offering, Defendant Zerella sold 216,000 shares of Company stock for $28.13 per share, for which he received proceeds of $6,076,080.

39.     Upon information and belief, Defendant Zerella was only able to participate in the Secondary Offering and make the November 18 sales because the lock-up restrictions in connection with the IPO were released prior to the expiration date. Defendant Zerella's insider sales made with knowledge of material non-public information, including the sales made after the suspicious waiver of the lock-up agreements and before the scheme was exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

**Defendant Friedman**

34.     Defendant Eric N. Friedman ("Friedman") is the co-founder of the Company and has served as a director since March 2007. He is currently the Company's Chief Technology Officer. According to the 2016 Proxy, as of March 31, 2016, Defendant Friedman beneficially owned 18,837,935 shares of the Company's Class B common stock, which was 28.9% of the Company's issued and outstanding Class B common stock and represented 23.4% of the total voting power.

35.     For the fiscal year 2014, Defendant Friedman received $7,835,088 in compensation from the Company. This included $222,179 in salary and $7,612,909 in stock and other compensation. For the fiscal year 2015, Defendant Friedman received $702,340 in compensation from the Company. This included $288,340 in salary and $414,000 in stock and other compensation.

36.     The 2016 Proxy stated the following about Defendant Friedman:

Eric N. Friedman is our co-founder and has served as a member of our board of directors since March 2007 and as an executive officer since September 2007, including most recently as our Chief Technology Officer. Previously, Mr. Friedman served as an engineer manager at CNET Networks. Prior to CNET Networks, Mr. Friedman served as a co-founder of Wind-Up Labs, a founding engineer of Epesi Technologies, and a technical member of the Real-Time Collaboration Group at Microsoft Corporation. Mr. Friedman holds a B.S. and an M.S. in computer science from Yale University. Mr. Friedman was selected to serve as a member of our board of directors due to the perspective and experience he brings as our co-founder and Chief Technology Officer.

37.     During the period of time when the Company engaged in wrongdoing to keep the stock price inflated, and before the scheme was exposed, Defendant Friedman made the following sales of Company stock.  On June 23, 2015, as part of the IPO, Defendant Friedman sold 1,095,817 shares of Company stock for $18.80 per share, for which he received proceeds of $20,601,359.  On November 18, 2015, as part of the Secondary Offering, Defendant Friedman sold 1,113,490 shares of Company stock for $28.13 per share, for which he received proceeds of $31,322,473. Thus, in total, before the fraud was exposed, Defendant Friedman sold 2,209,307 Company shares on inside information, for which he received approximately $52 million.

38.     Upon information and belief, Defendant Friedman was only able to participate in the Secondary Offering and make the November 18 sales because the lock-up restrictions in connection with the IPO were released prior to the expiration date. Defendant Friedman's insider sales made with knowledge of material non-public information before the scheme was exposed, some of which were made after the suspicious waiver of the lock-up agreements, demonstrate his motive in facilitating and participating in the wrongdoing.

**Defendant Callaghan**

39.     Defendant Jonathan D. Callaghan ("Callaghan") has served as a director since September 2008.  He is the Chairman of the Compensation Committee and a member of the Nominating and Governance Committee. According to the 2016 Proxy, as of March 31, 2016,

12

Defendant Callaghan beneficially owned 400,784 shares of the Company's Class A common stock and 26,297,033 shares of the Company's Class B common stock, which was 41.8% of the Company's issued and outstanding Class B common stock and represented 33.6% of the total voting power.[1] Given that the price per share of the Company's Class A common stock at the close of trading on March 31, 2016 was $15.15, Callaghan beneficially owned $6,071,878 worth of Fitbit Class A stock.

40.   The 2016 Proxy stated the following about Defendant Callaghan:

Jonathan D. Callaghan has served as a member of our board of directors since September 2008. Mr. Callaghan is a founder and has served as a Managing Member of True Ventures, a venture capital firm, since January 2006. Prior to True Ventures, Mr. Callaghan served as a Managing Director at Globespan Capital, a venture capital firm, and as a Managing Partner at CMGI@Ventures, CMGI Inc.'s affiliated venture capital group. Prior to this, Mr. Callaghan worked for AOL Inc.'s Greenhouse, the venture capital/incubator for AOL, and as an associate at Summit Partners. Mr. Callaghan holds an A.B. in government from Dartmouth College and an M.B.A. from Harvard Business School. Mr. Callaghan was selected to serve as a member of our board of directors due to his extensive experience with technology companies.

46.   During the period of time when the Company engaged in wrongdoing to keep the stock price inflated, and before the scheme was exposed, Defendant Callaghan made the following sales of Company stock.  On June 23, 2015, as part of the IPO, Defendant Callaghan sold 3,133,707 shares of Company stock for $18.80 per share, for which he received proceeds of $58,913,691.  On November 18, 2015, as part of the Secondary Offering, Defendant Callaghan

---

[1] Defendant Callaghan is one of the managing members of True Venture Partners II, L.L.C. and therefore has voting and dispositive power over the shares held by True Ventures II, L.P. and True Ventures II-A, L.P. Explaining the stock ownership of True Ventures II, L.P., the 2016 Proxy Statement states that it "[c]onsists of (i) 4,601 shares held by True Venture Management, L.L.C., which is controlled by Jonathan D. Callaghan and Philip Black and (ii) 26,297,033 shares held of record by True Ventures II, L.P., or TV II, a Delaware limited partnership, for itself and as nominee for True Ventures II-A, L.P., or TV II-A, a Delaware limited partnership. True Venture Partners II, L.L.C., or TVP II, a Delaware limited liability company, is the general partner of each of TV II and TV II-A. Jonathan D. Callaghan and Philip Black are the managing members of TVP II and, therefore, may be deemed to share voting and dispositive power over the shares held by TV II and TV II-A. The address for these entities is 530 Lytton Avenue, Suite 303, Palo Alto, California 94301."

sold 3,782,381 shares of Company stock for $28.13 per share, for which he received proceeds of $106,398,377. On December 9, 2015, Defendant Callaghan sold 1,077,957 shares of Company stock for $28.13 per share, for which he received proceeds of $30,322,930. Defendant Callaghan did not make any other sales thereafter until August 4, 2016.  Thus, in total, before the fraud was exposed, Defendant Callaghan sold 7,994,045 Company shares on inside information, for which he received approximately $196 million.

47.    Upon information and belief, Defendant Callaghan was only able to participate in the Secondary Offering and make the November 18 sales because the lock-up restrictions in connection with the IPO were released prior to the expiration date. Defendant Callaghan's insider sales made with knowledge of material non-public information before the scheme was exposed, some of which were made after the suspicious waiver of the lock-up agreements, demonstrate his motive in facilitating and participating in the wrongdoing.

**Defendant Murray**

41.    Defendant Steven Murray ("Murray") has served as a director of the Company since June 2013. He is currently the Chair of the Nominating and Governance Committee and a member of the Audit Committee.  According to the 2016 Proxy, as of March 31, 2016, Defendant Murray beneficially owned 7,139,993 shares of the Company's Class A common stock, which was 4.6% of the Company's issued and outstanding Class A common stock.[2] Given that the price per share of the Company's Class A common stock at the close of trading on

---

[2] As to Defendant Murray's stock ownership, the 2016 Proxy Statement states that it "[c]onsists of 7,139,993 shares of Class A common stock held by SoftBank PrinceVille Investments, L.P. SB PV GP L.P. is the general partner of SoftBank PrinceVille Investments, L.P. and SB PV GP LLC is the general partner of SB PV GP L.P. The managing members of SB PV GP LLC are Ronald D. Fisher, Kabir Misra, and Steven Murray, and, therefore, may be deemed to share voting and dispositive power over the shares held by SoftBank PrinceVille Investments, L.P. The address for these entities is 38 Glen Avenue, Newton, Massachusetts 02459."

14

March 31, 2016 was $15.15, Murray beneficially owned $108,170,894 worth of Fitbit Class A stock.

42.    For the fiscal year 2015, Defendant Murray received $47,137 in compensation from the Company, all in cash.

43.    The 2016 Proxy stated the following about Defendant Murray:

Steven Murray has served as a member of our board of directors since June 2013. Mr. Murray is a Partner at Revolution Growth, a venture capital firm, where he has worked since January 2016. From April 1996 to January 2016, Mr. Murray worked at SoftBank Capital, a venture capital firm, where he most recently served as a Partner. Prior to this, Mr. Murray worked for Deloitte & Touche LLP, where he specialized in serving high growth technology based businesses. Mr. Murray also serves on the board of directors for a number of private companies. Mr. Murray holds a B.S. in accounting from Boston College. Mr. Murray was selected to serve as a member of our board of directors due to his extensive experience with technology companies.

44.    During the period of time when the Company engaged in wrongdoing to keep the stock price inflated, and before the scheme was exposed, Defendant Murray made the following sales of Company stock.  On June 23, 2015, as part of the IPO, Defendant Murray sold 825,000 shares of Company stock for $18.80 per share, for which he received proceeds of $15,510,000. On November 18, 2015, as part of the Secondary Offering, Defendant Murray sold 936,641 shares of Company stock for $28.13 per share, for which he received proceeds of $26,347,711. On December 9, 2015, Defendant Murray sold 266,938 shares of Company stock for $28.13 per share, for which he received proceeds of $7,508,965. Defendant Murray did not make any other sales thereafter until March 4, 2016.  Thus, in total, before the fraud was exposed, Defendant Murray sold 2,028,579 Company shares on inside information, for which he received approximately $50 million.

45.    Upon information and belief, Defendant Murray was only able to participate in the Secondary Offering and make the November 18 sales because the lock-up restrictions in

connection with the IPO were released prior to the expiration date. Defendant Murray's insider sales made with knowledge of material non-public information before the scheme was exposed, some of which were made after the suspicious waiver of the lock-up agreements, demonstrate his motive in facilitating and participating in the wrongdoing.

**Defendant Paisley**

46.     Defendant Christopher Paisley ("Paisley") has served as a director of the Company since January 2015.  Defendant Paisley serves as Chair of the Audit Committee and a member of the Compensation Committee. According to the 2016 Proxy, as of March 31, 2016, Defendant Paisley beneficially owned 40,000 shares of the Company's Class B common stock.

47.     For the fiscal year 2015, Defendant Paisley received $462,457 in compensation from the Company. This included $53,029 in cash and $409,428 in stock.

48.     The 2016 Proxy stated the following about Defendant Paisley:

Christopher Paisley has served as a member of our board of directors since January 2015. Mr. Paisley has served as the Dean's Executive Professor of Accounting at the Leavey School of Business at Santa Clara University since January 2001. Prior to this, Mr. Paisley served as Senior Vice President of Finance and Chief Financial Officer for 3Com Corporation, a Fortune 500 computer networking manufacturer. Mr. Paisley currently serves on the boards of directors of Ambarella, Inc., Equinix, Inc., Fortinet, Inc., and YuMe, Inc. He also previously served as a director of Bridge Capital Holdings, Control4 Corporation, and Volterra Semiconductor Corporation. Mr. Paisley holds a B.A. in business economics from the University of California, Santa Barbara and an M.B.A. from the Anderson School at the University of California, Los Angeles. Mr. Paisley was selected to serve as a member of our board of directors due to his extensive board and operational experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors and/or fiduciaries of Fitbit and because of their ability to control the business and corporate affairs of Fitbit, the Individual Defendants owed Fitbit and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Fitbit in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fitbit and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Fitbit and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fitbit, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Fitbit were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fitbit, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Fitbit's Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter alia*, the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to prevent the engagement in deceptive marketing of its products.

55.     To discharge their duties, the officers and directors of Fitbit were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fitbit were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, and pursuant to Fitbit's own Code of Conduct and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Fitbit conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Fitbit and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fitbit's operations would comply with all laws and Fitbit's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.      Each of the Individual Defendants further owed to Fitbit and the shareholders the duty of loyalty requiring that each favor Fitbit's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Fitbit and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Fitbit, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fitbit.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, and the Individual Defendants' deceptive marketing and sales of the Company's products; (ii) conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) artificially inflate

20

the Company's stock price while certain Individual Defendants made illegal lucrative sales of Company stock based on material non-public information.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority and approval of the Board, each of the Individual Defendants who are directors of Fitbit was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fitbit, and was at all times acting within the course and scope of such agency.

## EMPLOYEE CODE OF CONDUCT

65.     Pursuant to the Company's Employee Code of Conduct, the Employee Code of Conduct applies to "every employee, including every officer, of the Company."

66.     The Employee Code of Conduct provides, as to "General Legal and Ethical Obligations," that:

The Company's success depends upon each employee performing his or her Company duties in compliance with applicable laws and in cooperation with governmental authorities. It is essential that employees know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While employees are not expected to have complete mastery of these laws, rules and regulations, they are expected to be able to recognize situations that require them to consult with others to determine the appropriate course of action. To address questions in the area of legal compliance, employees should approach their supervisor or the Compliance Officer immediately.

Legal compliance is only a part of the Company's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. The Company strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its employees. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help the Company become a better company, a better commercial partner for other companies, and a better corporate citizen.

67.     The Employee Code of Conduct provides, as to "Conflicts of Interest," that:

A conflict of interest occurs when an individual's private interest (or the interest of a member of his or her family) interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee (or a member of his or her family) takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest also arise when an employee (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

Every employee must avoid situations where loyalties may be divided between the Company's interests and the employee's own interests. Employees should also seek to avoid the appearance of a conflict of interest. If an employee is considering engaging in a transaction or activity that may present a conflict of interest or the appearance of a conflict of interest, the employee should disclose the matter to the Compliance Officer, so that, if appropriate, the Compliance Officer may disseminate such information and/or obtain approvals before the employee engages in such transaction or activity.

68.     The Employee Code of Conduct provides, as to "Insider Trading," that:

In the course of doing business for the Company, or in discussions with one of its customers, partners, service providers, distributors or suppliers, the Company's employees may become aware of material non-public information about the Company or another organization. Information is considered "material" if it might be used by an investor to make a decision to trade in the securities of the company. Employees may only use such information for the purpose of conducting the Company's business.

Federal law and Company policy prohibit employees, directly or indirectly through their

families or others, from purchasing or selling the Company's stock while in the possession of material, non-public information concerning the Company. This same prohibition applies to trading in the stock of other publicly held companies on the basis of material, non-public information.

If an employee is considering buying or selling a stock because of inside information he or she possesses, he or she should assume that such information is material. It is also important for the employee to keep in mind that if any trade he or she makes becomes the subject of an investigation by the government, the trade will be viewed after-the-fact with the benefit of hindsight. Consequently, employees should always carefully consider how their trades would look from this perspective.

If an employee's family or friends ask for advice about buying or selling the Company's stock, the employee should not provide it. Federal law and Company policy also prohibit the employee from "tipping" family or friends regarding material, non-public information that the employee learns about the Company or any other publicly traded company in the course of employment. The same penalties apply, regardless of whether the employee derives any benefit from the trade.

Because of the sensitive nature of and severe penalties associated with insider trading and tipping, employees must exercise the utmost care when in possession of material non-public information. All employees shall follow the guidelines and policies on securities trading issued by Company and should review the Company's Insider Trading Policy, as may be in effect.

69.     The Employee Code of Conduct provides, as to "Maintenance of Corporate Books, Records and Accounts; Financial Integrity; Public Reporting," that:

The Company strives to maintain complete integrity of its books and records and public disclosure. The Company's corporate and business records, including all supporting entries to its books of account, must be completed honestly, accurately and intelligibly. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting its obligations to customers, suppliers, creditors, employees and others with whom the Company does business. The Company depends on its books, records and accounts accurately and fairly reflecting, in reasonable detail, its assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.
…
The Company's disclosure controls and procedures are designed to help ensure that the Company's public disclosures are full, fair and accurate, that they fairly present its financial condition and results of operations, and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way to preparing or verifying these reports should adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be

23

important to enable investors to understand the Company's business and its attendant risks. In particular:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with GAAP, the rules and regulations of the Securities and Exchange Commission ("*SEC*") or other applicable laws, rules and regulations;
- all employees must cooperate fully with the Company's finance department, as well as the Company's independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and
- no employee shall knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or any third party or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

70.     The Employee Code of Conduct provides, as to "Protection and Proper Use of Company Assets," that:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. Theft, carelessness and waste have a direct impact on the Company's profitability. The Company's property, such as computer equipment, buildings, furniture and furnishings, office supplies and products and inventories, should be used only for activities related to employment, although incidental personal use is permitted. Employees should bear in mind that the Company retains the right to access, review, monitor and disclose any information transmitted, received or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Employees must immediately report any misuse or suspected misuse of the Company's assets to their supervisor or the Compliance Officer.

71.     As further proclaimed in the Employee Code of Conduct:

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Chief Executive Officer, Chief Financial Officer and senior finance department personnel must adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, controller and any other persons performing similar functions ("Senior Financial Employees"):

24

- Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to the Company.
- Avoid situations that represent actual or apparent conflicts of interest with his or her responsibilities to Company, and disclose promptly to the Audit Committee of the Board ("*Audit Committee*"), any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees shall not:
  - o accept any material gift or other gratuitous benefit from a customer, distributor, supplier, service provider or any vendor of products or services, including professional services, to the Company (this prohibition is not intended to preclude ordinary course entertainment or similar social events);
  - o except with the approval of the disinterested members of the Audit Committee, directly invest in any privately-held company that is a customer, partner, service provider, distributor, supplier or vendor of the Company where the Senior Financial Employee, either directly or through people in his or her chain of command, has responsibility or ability to affect or implement the Company's relationship with the other company; or
  - o maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a customer, partner, service provider, distributor, supplier or vendor of the Company.
- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.
- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.
- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

72.     In violation of the Employee Code of Conduct, Individual Defendants who were officers (Park, Zerella, and Friedman) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' schemes to market and sell defective products, issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment. In violation of the Employee Code of Conduct, the Individual Defendants

consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) engage in fair dealing, (4) avoid conflicts of interest, (5) report violations of the Employee Code of Conduct, (6) appropriately maintain the Company's books, records, accounts, and financial statements, and (7) make accurate filings with the SEC.

## DIRECTOR CODE OF CONDUCT

73.     Pursuant to the Company's Director Code of Conduct, the Director Code of Conduct applies to "every member of the Company's Board of Directors." The Company adopted this Code for Directors with the intention "to apply the same high standards of honest and ethical business conduct to directors as are applied to officers and employees."

74.     The Director Code of Conduct provides, as to "Legal Compliance," that:

Every director must always obey the law while performing his or her duties to the Company as a director. The Company's success depends upon each director operating within legal guidelines and cooperating with authorities. It is essential that each director knows and understands the legal and regulatory requirements that apply to the Company's business and to his or her responsibility as a director. While a director is not expected to have complete mastery of these laws, rules and regulations, directors are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If a director has a question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, the Company's General Counsel) immediately.

75.     The Director Code of Conduct provides, as to "Insider Trading," that:

Every director is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code and other Company policies, to tip or to trade on inside information. Directors are not permitted to use or share inside information for stock trading purposes or for any other purpose except to conduct Company business.

Directors must exercise the utmost care when in possession of material nonpublic information. The Company's Insider Trading Policy (the "***Insider Trading Policy***") provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how a director may purchase or sell shares of

Company stock or other Company securities. Please review the Insider Trading Policy for additional information.

76.    The Director Code of Conduct provides, as to "Financial Integrity; Public Reporting," that:

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "**SEC**") and other public disclosures are complete, fair and accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- Act honestly, ethically, and with integrity;
- Comply with this Code;
- Endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;
- Raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;
- Act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
- Comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If a director becomes aware that the Company's public disclosures are not complete, fair and accurate, or if the director becomes aware of a transaction or development that the director believes may require disclosure, the director should report the matter immediately to the Chair (or, in the case of the Chair, the Company's General Counsel).

77.    The Director Code of Conduct provides, as to "Protection and Proper Use of Company Assets," that:

Theft, carelessness and waste have a direct impact on the Company's profitability. Any misuse or suspected misuse of the Company's assets that becomes known to a director must be immediately reported to the Chair (or, in the case of the Chair, the Company's General Counsel).

78.      In violation of the Director Code of Conduct, the director Individual Defendants (Park, Friedman, Callaghan, Murray, and Paisley) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' schemes to market and sell defective products, issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment. In violation of the Employee Code of Conduct, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) protect corporate assets, (3) engage in fair dealing, (4) avoid conflicts of interest, (5) report violations of the Employee Code of Conduct, (6) appropriately maintain the Company's books, records, accounts, and financial statements, and (7) make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Fitbit History

79.      Since it was founded in 2007, Fitbit has released a variety of wrist-based activity trackers that it claims will help users to achieve their health and fitness goals. Fitbit trackers' features have included, among other things, tracking steps taken, calories burned, distance traveled, active minutes, and sleep duration and quality.

80.      In an October 27, 2014 press release (the "10/27/14 Press Release"), Fitbit introduced a new heart rate tracking feature and announced two fitness trackers equipped with the Company's new proprietary technology called "PurePulse." PurePulse uses LED lights to detect changes in capillary blood volume when the heart beats and then applies finely tuned algorithms to measure user's heart rate. According to the Company, this technology tracks heart

rate "automatically and continuously, without any button-pushing and without an uncomfortable chest strap."

81.     The first two products that contained the heart rate feature were "Fitbit Charge HR" and "Fitbit Surge," which were retailed at approximately $150 and $250, respectively. Along with these two products, the Company announced the "Fitbit Charge," a tracker almost identical to the Fitbit Charge HR except for the heart rate feature. Fitbit Charge was retailed at approximately $130, showing the significant premium Fitbit charged for the heart rate monitoring feature.

82.     In March 2016, the Company introduced a third tracker with the heart rate feature, the "Fitbit Blaze," which retailed for approximately $200.   All three trackers featuring the PurePulse technology are referred to as the "PurePulse Trackers."

**About Heart Rate Monitoring**

83.     Heart rate monitoring is a feature appealing to many consumers, especially to exercise lovers.  Among other things, devices containing this feature can help general exercisers achieve and maintain proper intensity during workouts, measure effort, track progress, more accurately estimate calories burned, and stay motivated. Heart rate monitoring can be even more useful to athletes seeking to optimize their training.  Real-time heart rate data can help athletes maintain a heart rate that is sufficiently high to provide a good workout, but not so high as to threaten their cardiovascular health.

84.     Besides athletes, people above a certain age or with specific medical conditions may find heart rate monitoring devices essential for them to stay safe. Some patients' doctors advise them to maintain their heart rates in a certain range for health and safety purposes.

85.     However, many of the benefits mentioned above could only be achieved if the heart rate reading is reliable and fairly accurate. Otherwise, the heart rate monitoring feature would become so meaningless, or even worse, would be dangerous and harmful to users' health by relaying false information.

86.     Traditionally, accurate heart rate monitoring required a chest strap, which can be uncomfortable, distracting, difficult to wear, and difficult to clean. Fitbit attempted to circumvent these problems with its wrist-based PurePulse technology, which it expressly contrasts with "uncomfortable" chest straps.

87.     Since Fitbit introduced the PurePulse technology, Individual Defendants have caused the company to represent on many occasions that the PurePulse technology was the result of years of research and development and has passed independent lab tests. For example, in a March 27, 2015 article in the Washington Post, Defendant Park stated that PurePulse "was the result of three years of R&D effort."  About three months later, on August 5, 2015, Defendant Park also represented to Fitbit investors and stock market analysts in a conference call that "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect. The key thing for us is we will only launch products when we feel they are ready."

88.     Additionally, Fitbit also indicated in the 10/27/14 Press Release, in which it introduced the PurePulse technology and the new heart rate monitoring trackers, that "Fitbit consults with scientific experts and also tests its products with independent labs to ensure they meet stringent standards." Fitbit also mentioned that it had created "the first-ever Scientific Advisory Board for wearables that includes leading, certified dermatologists to help enhance Fitbit's testing protocols and develop product wear and care guidelines."

89.     Individual Defendant wanted Fitbit to deliver the message that its PurePulse technology was "ready" and reliable.

**Fitbit's False and Misleading Advertising**

90.     Since the release of PurePulse trackers, the PurePulse technology and the heart rate tracking feature became the centerpiece of Fitbit's promotional efforts. To emphasize the benefits of PurePulse, Fitbit used widely-circulated slogans like: "Know Your Heart," "Every Beat Counts," "Get the Benefits of Continuous Heart Rate," and "For Better Fitness, Start with Heart."

91.     In the 10/27/14 Press Release, Fitbit described some of the benefits its new heart rate tracking feature can provide:

- Get accurate calorie burn for more activities during exercise and everyday activities like walking, running, biking, lifting weights, spinning, skiing, yoga, Pilates and more
- Maximize training with fat burning, cardio and peak heart rate zones
- Maintain workout intensity by reaching your target heart rate
- Optimize health through heart rate trends and resting heart rate, an important measure of overall heart health and cardiovascular fitness

…

"Whether your goal is to become more active, improve your heart health or lose weight, tracking everyday activity and heart rate is essential," said Harley Pasternak, best-selling fitness and nutrition author, personal trainer and Fitbit brand ambassador. "Heart rate tracking is the most accurate way to measure calorie burn, helping you maximize workouts while still properly fueling your body. With Fitbit's new heart rate feature, users have access to more information than ever before, making it even easier to access the information needed to track, reach and beat goals."

92.     The benefits listed above can also be found on the Company's website page that introduces PurePulse.[3] On the website, Fitbit also markets PurePulse as enabling users to measure heart rate "both all day and during workouts." It suggests users to use Fitbit's heart rate zones to "maintain the right intensity" and to "find a sweet spot for pace or avoid overtraining."

---

[3] Fitbit PurePulse, https://www.fitbit.com/purepulse (last visited January 20, 2016).

Basically, a user may gauge his/her training efforts or adjust training goals upon monitoring which "simplified heart rate zones" ("fat burn", "cardio," or "peak") the user's heart rate falls into.

93.     While Fitbit targeted Fitbit Charge towards consumers looking to track "everyday activity," such as walking and sleeping, it marketed Charge HR and Surge as designed for "more active users" and "performance users."

94.     In numerous marketing materials, Fitbit has depicted users wearing the PurePulse Trackers while engaging in strenuous activities, such as jumping rope, boxing, jogging, running, and doing sit-ups and squats.

95.     Under the Individual Defendants' direction and on their watch, Fitbit's advertising efforts focused on PurePulse Trackers' ability to improve heart fitness and to consistently record accurate heart rates even during vigorous exercise. However, many of Fitbit's claims and statements contained in its marketing materials or made in its promotional events were materially false or misleading.

## **PurePulse Trackers Were Defectively Designed and Were Not Able to Consistently Track Accurate Heart Rate, Particularly During Exercise**

96.     Beginning in October 2014, for the purpose of marketing and selling its PurePulse Trackers, the Individual Defendants caused the Company to falsely represent the products to be beneficial to users' health, to claim that the products can accurately and consistently track wearers' heart rate even during intense activity, including the exercises Fitbit employed to promote the trackers. In reality, the Company had knowledge that these PurePulse Trackers were defectively designed and were not able to accurately and consistently track one's heart rate. Thus, contrary to what Fitbit had promoted, not only were these PurePulse trackers not beneficial to users' health, they could potentially be harmful and dangerous.

32

97.     Among other things, capturing an accurate heart rate reading from one's wrist is far more difficult than from a monitor firmly secured to one's chest as wrists are generally exposed and frequently in motion, especially when one engages in the kind of exercises featured in Fitbit's marketing materials. The accuracy of PurePulse Trackers may easily be affected by surrounding light interfering with the wristband sensor and by the fact that the trackers may not be constantly secured to one's arm. The fact that the PurePulse Trackers have to detect blood changes from users' wrists, which were far down the arm and away from the heart, and then go through a second step to be able to eventually estimate the heart rate also made people doubt the accuracy of the trackers.

98.     In early 2015, many negative consumer and professional reviews were already posted online questioning PurePulse Tracker's heart rate reading capacities.

99.     For example, under the title "Fitbit Charge HR review: a heart-rate tracker that's skipped a beat," a technology editor for the *Guardian* named Samuel Gibbs concluded that Fitbit Charge HR "doesn't provide any meaningful, useful data from measuring heart rate." More specifically, he wrote, "Considering at full sprint I only managed to record a maximum of 155 beats per minute, I think either the sensor is flawed or Fitbit's heart rate bands are a bit optimistic."[4] In another review he wrote for the Fitbit Surge, he noted that the Surge was "less capable of tracking a run as the weight of the watch and sweat build up meant it moved around even when drawn tight, producing variable heart rate readings."

100.    A review of the Charge HR for *Wired* magazine also concluded that the heart-rate tracking can be inaccurate during high intensity workouts. The reviewer wrote, "It could sometimes measure 'peaks' into the 160s, but according to a heart rate strap, I spent a good

---

[4]     https://www.theguardian.com/technology/2015/feb/13/fitbit-charge-hr-review-heart-rate-tracker     (last visited January 20, 2016)

amount of time in the 180s. I set a custom zone up to my actual max heart rate in the app, but it was unable to detect a heart rate that rapid."

101.    Despite all the negative reviews, the Individual Defendants continued to fraudulently market and sell the defective products, and more egregiously, caused the Company to conduct the IPO and the Secondary Offering based on material false and misleading statements.

### **Individual Defendants Caused the Company to Conduct the IPO**

102.    On May 7, 2015, Individual Defendants caused the Company to file a registration statement on Form S-1 with the SEC relating to a proposed IPO of its Class A common stock. The registration statement was subsequently amended four times, with the final amended statement filed on Form S-1/A on June 16, 2015 (collectively, the "IPO Registration Statement").

103.    On June 17, 2015, the SEC declared the IPO Registration Statement effective. The same day, the Company announced the pricing of its initial public offering of 36,575,000 shares of its Class A common stock at a price to the public of $20.00 per share. The underwriters had been granted an option to purchase up to an additional 5,486,250 shares of Class A common stock.

104.    The IPO Registration Statement contained a preliminary prospectus. The final prospectus (the "IPO Prospectus") was filed on June 18, 2015.

105.    On June 23, 2015, the Company announced the closing of its IPO and the full exercise of the underwriters' option to purchase additional shares. Fitbit sold 22,387,500 shares and the selling stockholders (including defendants Park, Friedman, Callaghan, and Murray) collectively sold 19,673,750 shares, including the shares sold upon exercise of the underwriters'

option to purchase additional shares, for a total of $841.2 million in aggregate gross proceeds to Fitbit and the selling stockholders.

106.   In connection with the IPO, all of Fitbit's directors, executive officers, and holders of substantially all of the Company's securities outstanding prior to the IPO entered into lock-up and market standoff agreements that prohibited these insiders and shareholders from selling any shares of Fitbit's common stock for at least 180 days following the date of the IPO prospectus, or until December 14, 2015 (the "Lock-Up Agreements"). The IPO Prospectus states the following, in pertinent part:

> [A]ll of our security holders have entered into market standoff agreements with us or lock-up agreements with the underwriters under which they have agreed, subject to specific exceptions, not to sell any of our stock for at least 180 days following the date of this prospectus, as described below.
> …
>
> **Lock-Up Agreements and Market Standoff Provisions**
>
> All of our directors, executive officers, and the holders of substantially all of our outstanding equity securities are subject to lock-up agreements with the underwriters or market standoff provisions in agreements with us that, subject to certain exceptions, prohibit them from offering for sale, selling, contracting to sell, granting any option for the sale of, transferring, or otherwise disposing of any shares of our common stock, options, or warrants to acquire shares of our common stock, or any security or instrument related to this common stock, option, or warrant for a period of at least 180 days following the date of this prospectus, without the prior written consent of Morgan Stanley & Co. LLC or us, as the case may be.
>
> …
>
> We, all of our directors and officers, and the holders of substantially all of our outstanding equity securities have agreed that, without the prior written consent of Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, for 180 days after the date of this prospectus:
> - offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for shares of Class A common stock or Class B common stock;

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of Class A common stock or Class B common stock, whether any such transaction described in these first two bullet points is to be settled by delivery of Class A common stock, Class B common stock, or such other securities, in cash or otherwise;

- in the case of our directors, officers, and security holders, make any demand for or exercise any right with respect to, the registration of any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for Class A common stock or Class B common stock;

- in our case, file any registration statement with the SEC relating to the offering of any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for Class A common stock or Class B common stock, except for the filing of registration statements on Form S-8 with respect to the employee benefit plans described in this prospectus; or

- in our case, make any public announcement of any intention to do any of the foregoing.

### **Individual Defendants Caused the Company to Request A Release from the Lock-up Agreements and Conducted the Secondary Offering**

107.    On November 2, 2015, the Company filed a current report on Form 8-K with the SEC (the "11/2/15 8-K") announcing that Morgan Stanley & Co. LLC, the representative of the underwriters of the Company's IPO, has agreed to release the lock-up restrictions for Fitbit's employees and consultants as of October 31, 2015. Upon information and belief, this release of the Lock-Up Agreements occurred under Individual Defendants' direction and on their watch, and was actually caused and initiated by the Board. The 11/2/15 8-K stated, in relevant part:

> Fitbit also announces today that Morgan Stanley & Co. LLC, on behalf of the underwriters of Fitbit's initial public offering in June 2015, ***at the request of Fitbit***, has agreed to release the lock-up restrictions for Fitbit's employees and consultants as of October 31, 2015 with respect to approximately 2.3 million shares, which represents up to 10% of the shares of Fitbit common stock, options, and restricted stock units held by such employees and consultants. The release will be effective on November 4, 2015. ***This will allow Fitbit's employees and consultants an opportunity in 2015 for liquidity prior to commencement of Fitbit's quarter end blackout period, which would prohibit any sales until that period ends after the earnings release for the fourth quarter of 2015. The lock-up restrictions are scheduled to expire with respect to the remaining shares as originally planned on December 14, 2015.***

(Emphasis added.)

108.    Then, on the same day, Individual Defendants caused the Company to file a registration statement on Form S-1 with the SEC relating to the Secondary Offering, which allowed the Company and certain of the Individual Defendants to sell additional shares on insider information before the scheduled expiration date of the lock-up restrictions and to receive benefits that were not equally shared by all those who owned Company stock prior to the IPO and continued to own it.

109.    The amended and final registration statement for the Secondary Offering was filed on Form S-1/A on November 9, 2015 (collectively with the Form S-1, the "Secondary Offering Registration Statement"). On November 12, 2015, the SEC declared the Secondary Offering Registration Statement effective.

110.    The Secondary Offering Registration Statement contained a preliminary prospectus. The final prospectus (the "Secondary Offering Prospectus") was filed on November 13, 2015.

111.    During the Secondary Offering, Fitbit sold 3,000,000 shares and the selling stockholders (including defendants Park, Zerella, Friedman, Callaghan, and Murray) collectively sold 16,550,000 shares, including the shares sold upon exercise of the underwriters' option to purchase additional shares. The Company raised net proceeds of approximately $84.4 million.

**The PurePulse Trackers and Especially the Heart Monitoring Feature Were the Impetus Behind Fitbit's Rapid Expansion**

112.    Fitbit's quick growth and rapid expansion was primarily driven by the sale of the PurePulse Trackers.

113.    As Fitbit noted in its IPO Prospectus, the Fitbit Charge, Fitbit Charge HR, and Fitbit Surge were "the primary drivers of our revenue growth in the first quarter of 2015."

114.    Defendant Zerella also represented to investors and analysts in a conference call held on August 5, 2015 that "Our second-quarter revenue growth was driven by our newest products, Charge, Charge HR, and Surge, which collectively accounted for approximately 78% of our revenue. Also in the conference call, when asked by an analyst whether he expected "[t]he mix of the newer products, the Charge HR, Surge being 78% this quarter… to be relatively constant as the year progresses," Defendant Zerella responded, "obviously, they already dominate our revenue streams. We would expect a similar mix through the second half."

115.    Later, on Fitbit's November 2, 2015 conference call with investors and analysts to discuss the financial results for its third quarter of 2015, Defendant Park stated "our new products, Charge, Charge HR, and Surge, obviously represents roughly almost 80% of our business at this point in time." Similarly, an analyst asked whether Fitbit's revenues would continue to come primarily from Charge HR and Surge. In response to this question, Defendant Park stated, "I think probably the safest bet would be to say we're going to stay within the range that we've been over the last couple of quarters for a while."

116.    Also, in a November 3, 2015 interview for *Bloomberg Radio* titled "Fitbit Growing on Sales to Target," Defendant Park stated that:

> [O]ur PurePulse optical heart rate technology, which in our Charge HR and Surge devices, took over three years to develop, and so, you know, that's resulted in two products which are incredible leaders in the categories. So Fitbit Charge HR is a number one wearable activity tracking device in the market today and Fitbit Surge is the number one GPS fitness watch, so I think that's a great example of how our technology developments has resulted in really break-through products.[5]

117.    Ultimately, driven by sales of these products with PurePulse technology, Fitbit's revenues reached a total of $1.86 billion in 2015, compared to $745.4 million in 2014.

---

[5]    https://www.bloomberg.com/news/audio/2015-11-03/bloomberg-advantage-fitbit-growing-on-sales-to-target-bp (last visited January 22, 2017).

118.    As the major selling point of Fitbit's most popular products, the accuracy of PurePulse was particularly crucial to Fitbit's success as a business. Any misrepresentations regarding the accuracy of Fitbit's heart rate tracking would thus have a material impact on the Company.

### The Consumer Class Actions Exposed the Truth to the World

119.    The truth began to emerge on January 5, 2016, when the first consumer class action, captioned *McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal), was filed against Fitbit in the United States District for the Northern District of California, alleging that the PurePulse heart rate monitoring technology in the Fitbit Charge HR and Fitbit Surge failed to consistently and accurately record users' heart rates and posed serious health risks to users (the "First Consumer Class Action"). The First Consumer Class Action plaintiffs alleged common law claims as well as violations of various states' false advertising and unfair competition statutes based on Fitbit's sale and marketing of the PurePulse Trackers.

120.    According to the First Consumer Class Action, the PurePulse Trackers "consistently mis-record heart rate by a very significant margin, particularly during exercise." This was contrary to what Individual Defendants had caused the Company to advertise. Numerous consumer complaints and an expert analysis all proved the inability of the PurePulse Trackers to perform as promised and warranted. A test conducted by a board-certified cardiologist showed the following results:

> At intensities over 110 bpm, the Heart Rate Trackers often failed to record any heart rate at all. And even when they did record heart rates, the Heart Rate Trackers were inaccurate by an average of 24.34 bpm, with some readings off by as much as 75 bpm.

121.    Based on the test results and the consumer complaints, the First Consumer Class Action plaintiffs concluded that the PurePulse Trackers are "effectively worthless as heart rate monitoring devices" with such margins of error.

122.    On January 5, 2016, Fibit's stock price fell from a high of $30.96 per share to close at $24.30 per share, following an unusually high trading volume.

123.    On January 5 and January 6, 2016, a number of online media sources, including *Bloomberg, Fortune, and Reuters*, reported on the First Consumer Class Action and the massive decline in Fitbit's stock price. Among other reports, a media report published on January 6 quoted an analyst as stating that the First Consumer Class Action contributed to a "perfect storm" for Fitbit.[6] According to the analyst, the lawsuit was "aimed at the heart of Fitbit's portfolio." He estimated that Charge HR accounts for 40% to 50% of sales of Fitbit and the Surge accounts for 15% to 20% of sales of Fitbit.

124.    On January 6, 2016, Fitbit's stock price dropped 5.8% from the previous day to close at $22.90 per share.

125.    Fitbit's stock continued to experience unusually high volume and continued to decline in value on January 7, 2016 as the markets gradually absorbed the false and misleading nature of Fitbit's prior statements (under the Individual Defendants' direction and on their watch) concerning the accuracy of Fitbit heart rate tracking.

126.    On January 7, 2016, Fitbit's stock price further dropped from the previous day's close of $22.90 per share to a low of $20.25 per share.

127.    In only two days following the filing of the First Consumer Class Action, the Company's stock value experienced a loss of 34.6%.

---

[6] Patrick Seitz, *Fitbit fall giving investors heart attack*, Investors Business Daily (Jan. 6, 2016) http://www.investors.com/news/technology/click/fitbit-fall-giving-investors-heart-attack/.

128.    On February 16, 2016, another consumer class action lawsuit captioned *Landers et al. v. Fitbit, Inc.*, 3:16-cv-00777 (N.D. Cal) was filed against the Company in the United States District for the Northern District of California (the "Second Consumer Class Action"). The Second Consumer Class Action made substantially similar allegations as the First Consumer Class Action and was later consolidated with it (the "Consolidated Consumer Class Action").

129.    About one week later, after the close of trading on February 22, 2016, an Indianapolis television station WTHR posted on its website the results of the "fitness tracker test" it commissioned with researchers at Ball State University's Human Performance Laboratory. The researchers compared the Fitbit Charge HR against sophisticated laboratory fitness equipment during hour-long tests covering both high and low intensity activities. The Fitbit test results were abysmal. As the title of the article tells consumers, "Sometimes your fitness tracker lies -- a lot." Specifically, the heading of the section addressing heart rate read "Heart rate: Bordering on dangerous." The article noted:

> The box for the Fitbit Charge HR says "every beat counts." Despite what the package says, the tracking device inside missed lots of them.
>
> For example, when the Fitbit detected Alexis' heart rate at 68 beats per minute, the portable pulse oximeter showed her real heart rate was actually much higher at 91.
>
> …
>
> ***Calculating a heart rate that's off by 20 or 30 beats per minute can be dangerous -- especially for people at high risk of heart disease.***
>
> "That's too high to be acceptable to us," Montoye said. "Heart rate is a measure of exercise intensity. Small changes in intensity can affect the benefit you'll receive, but they also increase your risk associated with the activity. That risk can be very real … so the heart rate has to be accurate."
>
> Unlike steps, distance and calories -- which the professor prefers to see with error rates of less than 10% -- Montoye says ***the desired error for heart rate should be less than 5% or within 5 beats per minute.***

41

> The average heart rate error for the Garmin Vivosmart HR was about 10% and ***the Fitbit Charge HR averaged an even worse 14%.***

(Emphasis added.)

130.    Thus, the average heart rate error for the PurePulse heart rate reading was almost triple what the researchers deemed to be an acceptable margin of error and was 40% less accurate than the competitor device being tested. Notably, the calorie tracking of PurePulse Trackers performed unsatisfactorily, as well. Fitbit boasted in its promotional materials that the PurePulse Trackers could provide better calorie burn tracking by monitoring the user's heart rate. However, the numbers provided by the PurePulse Trackers "aren't even close" to the real number. In fact, the Charge HR over-recorded one subject's calorie burn by 122%.

131.    On the next day, February 23, Fitbit's stock price plunged 27.9% to close at $13.08 per share.

132.    Eventually, on May 19, 2016, the Consolidated Consumer Class Action plaintiffs filed an amended consolidated complaint (the "Amended Consolidated Consumer Class Action Complaint"), which contained the results of the most thorough and comprehensive study of the PurePulse Trackers performed to date, and a peer-review-quality report.

133.    Researchers at Cal Poly Pomona tested the PurePulse Trackers on 43 separate subjects during a variety of activities, including the exercises depicted by Fitbit when marketing the Trackers. After analyzing more than 46 hours' worth of comparative data, the researchers concluded that "the PurePulse Trackers do not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate."

134.    Indeed, the data revealed that during moderate to high intensity exercise, the PurePulse Trackers mis-recorded heart rates by an average of 19.2 bpm. If the instances in which

the Fitbit devices recorded no heart rate at all are taken into consideration, this discrepancy could go up to 24.23 bpm. Notably, the report also indicated that the PurePulse Trackers were not only inaccurate, but also surprisingly inconsistent. When two devices simultaneously recorded the same user's heart rate, they were off even from each other by an average of 10 bpm.

135.    The Amended Consolidated Consumer Class Action Complaint also discussed several independent media reviews, including the WTHR review, and questioned Fitbit's inability to reasonably respond to any of above-mentioned studies or reviews with its own studies. Despite having repeatedly asserted that "our team has performed and continues to perform internal studies to validate our products' performance," Fitbit had not referenced a single, specific study which it contends in fact validates its products' performance, nor has it disclosed the details of any study.

136.    Following the filing of the Amended Consolidated Consumer Class Action Complaint, Fitbit's stock declined from the previous day's closing price of $14.13 per share to close at $13.99 per share.

137.    As a result of the false and misleading statements Individual Defendants caused Fitbit to make concerning the accuracy of Fitbit's heart rate tracking, Fitbit securities were offered and traded at inflated prices. After the truth was exposed, however, the Company's stock value dropped 54.8% in a short period of time, significantly damaging the Company.

**SEC Rule Regulating Material Disclosures**

138.    Pursuant to Item 303 of Regulation S-K (17 C.F.R. § 229,303), and the interpretative releases related thereto, issuers are required to disclose events or uncertainties that have had, or are reasonably likely to cause, the issuer's financial information not to be indicative of future operating results. Any adverse events and/or uncertainties associated with the success

of the PurePulse Trackers were reasonably likely to have a material impact on Fitbit's profitability. The Individual Defendants breached their duties by causing the Company's statements in SEC filings and press releases to fail to disclose this material information.

## Material Misrepresentations and Omissions During the Relevant Period

139.    The IPO Prospectus filed by the Company on June 18, 2015 contained material misrepresentations and omissions because it gave investors the false impression that Fitbit's PurePulse Trackers were "specifically oriented towards health and fitness" and had "accurate measurements," even when users participate in activities with "higher intensity." As discussed above, Fibit's heart rate tracking devices were grossly inaccurate, especially during moderate to high intensity activities.

140.    Specifically, under the direction and on the watch of Individual Defendants, Fitbit stated in the "Prospectus Summary" section:

> We dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that our products have highly accurate measurements, insightful analytics, compact sizes, durability, and long battery lives.
>
> …
>
> **Our Competitive Strengths—What Sets Us Apart**
>
> ***Advanced, purpose-built hardware and software technologies.*** Our connected health and fitness devices leverage industry-standard technologies, such as Bluetooth low energy, as well as proprietary technologies, such as our PurePulse continuous heart rate tracking, and our algorithms that more accurately measure and analyze user health and fitness metrics. Our online and mobile apps provide in-depth analysis and guidance and our highly-scalable cloud infrastructure enables millions of users around the world to engage with our platform in real-time.

(Emphasis in original.)

141.   Under the direction and on the watch of Individual Defendants, the Company further stated in the "Business" section of the IPO Prospectus, in pertinent part:

> ***Tracking activities through our connected health and fitness devices.*** We empower users to live healthier, more active lifestyles by both tracking the information that matters most to them and providing them with real-time feedback. Our connected health and fitness devices span multiple styles, form factors, and price points, ***addressing the needs of everyone—from people simply looking to get fit by increasing their activity levels to endurance athletes seeking to maximize their performance.*** Our devices, which include wrist-based and clippable fitness trackers and our Wi-Fi connected scale, ***feature proprietary and advanced sensor technologies and algorithms as well as high accuracy*** and long battery life. In addition, the ease of use and small, lightweight, and durable designs of our devices make them fit effortlessly into our users' lifestyles.
> …
>
> **Our Users**
>
> We aim to empower all people to improve their health and fitness, whatever their lifestyle or goals. Our community of users generally falls into three fitness levels and we design and market our products to them accordingly:
>
> ***Everyday users*** represent our largest group of users. These users are looking to incorporate more activity into their daily routines as the primary means to improve their overall fitness through everyday activities, such as walking more or taking the stairs instead of the elevator. They are most interested in receiving feedback on daily activity measures such as steps, distance, calories burned, and active minutes. We primarily market the Fitbit Zip, Fitbit One, Fitbit Flex, and Fitbit Charge to Everyday users.
>
> ***Active users*** exercise regularly to reach their fitness goals through activities such as running, using cardio equipment, and playing sports recreationally. ***As a result, these users are often interested in monitoring exercise intensity through heart rate tracking in addition to activity tracking. We primarily market the Fitbit Charge HR to Active users.***
>
> ***Performance users*** train regularly to improve their performance and achieve their personal bests. ***These users participate in endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling, and thrive on personal improvement and competition.*** Accordingly, these users are interested in GPS tracking of speed, distance, and exercise routes, in addition to heart rate and daily activity tracking. ***We primarily market the Fitbit Surge to Performance users.***
>
> …
>
> ***Heart rate.*** On trackers that are outfitted with our proprietary PurePulse technology, our users are able to ***automatically and continuously track their heart rate during everyday***

45

*activity and exercise*. Our PurePulse technology uses wrist-based optical LEDs, which measures heart rate using light reflection. ***We believe our PurePulse technology makes heart rate relevant as a means to more accurately measure calorie burn, maintain intensity during exercise, and train more effectively by using heart rate zones.*** Additionally, our heart rate tracking technology can conveniently provide our users with their resting heart rate, which is a widely used indicator of cardiovascular fitness and conditioning.

(Emphasis added.)

142.    The statements referenced above in ¶¶ 140-141 were materially false and misleading because Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were wildly inaccurate during moderate to high intensity activities. Despite having the opportunity to do so, nowhere did the IPO Prospectus discuss any concerns of design defect, health risks, or consumer fraud attributed to the inaccuracy of its PurePulse technology. On the contrary, the Company expressively stated that it primarily marketed the inaccurate PurePulse Trackers to active users and performance users, to help them "more accurately measure calorie burn, maintain intensity during exercise, and train more effectively by using heart rate zones."

143.    On August 5, 2015, Fitbit issued a press release announcing its financial and operating results for the second quarter ended June 30, 2015 (the "6/30/15 Press Release"). In the 6/30/15 Press Release, Defendant Park stated, "Our second quarter results included our highest quarterly revenue in the eight-year history of Fitbit." He further noted, "In the quarter, we introduced new features and services, expanded brand awareness, increased global distribution and further penetrated the corporate wellness market. We remain focused on continuing to deliver innovative products and services that empower people around the world to reach their health and fitness goals."

144.    In the conference call Fitbit held the same day with investors and analysts, Defendant Park stated, "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect. The key thing for us is we will only launch products when we feel they are ready."

145.    The statements referenced above in ¶¶ 143-144 were materially false and misleading because they falsely implied that PurePulse technology and PurePulse Trackers were "ready" to provide users the benefits Fitbit outlined in its marketing materials, and failed to disclose that the PurePulse Trackers were not consistently accurate in heart rate monitoring and were particularly inaccurate during moderate to high intensity activities.

146.    The Secondary Offering Prospectus filed by the Company on November 9, 2015 contained the same misrepresentations and omissions it made in the IPO Prospectus about the accuracy of Fitbit's heart monitoring and about the ability of PurePulse Trackers to track heart rate during moderate to high intensity activities, as referenced in ¶¶ 140-141.

147.    On November 23, 2015, Fitbit issued a press release titled "Fitbit Charge HR and Fitbit Surge Now Automatically Track Common Exercises Like Biking, Hiking, Running, and Sports Including Basketball, Soccer and Tennis" (the "11/23/15 Press Release"). In the press release, the Company advised investors that they had updated the PurePulse technology to provide users with an "even better heart rate tracking experience during and after high-intensity workouts." The relevant part of the 11/23/15 Press Release stated the following:

**Enhanced Real-Time Heart Rate Tracking During Workouts**

Fitbit's proprietary PurePulse heart rate technology has been updated to provide users with an ***even better heart rate tracking experience during and after high-intensity workouts like boot camp and Zumba.*** The update is activated when using Exercise Mode on Fitbit Charge HR and multi-sport modes on Fitbit Surge. PurePulse optical technology provides users with ***continuous, automatic wrist-based heart rate tracking including resting heart rate and heart rate trends over time*** - without the need for an

uncomfortable chest strap.

Fitbit is dedicated to developing *the most consistently accurate wrist-based activity trackers* on the market. This software update *improves upon an already positive heart rate tracking offering*.

148.    The statements referenced in the above paragraph were materially false and misleading because later lawsuits and comprehensive studies revealed that Fibit's heart rate tracking devices were grossly inaccurate, especially during moderate to high intensity activities, including "workouts like boot camp and Zumba."

149.    On February 29, 2016, Fitbit filed its Annual Report for the quarter and year ended December 31, 2015 on Form 10-K with the SEC (the "2015 10-K"), which was signed by the Individual Defendants. The Company reported revenue of $711.6 million for the fourth quarter of 2015 and $1.86 billion for the full year. The 2015 10-K repeated the false and misleading statements from the IPO Prospectus and the Secondary Offering Prospectus, as set forth above.

150.    Attached to the 2015 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Park and Zerella attesting to the accuracy of the 2015 10-K.

151.    The Company's SOX certifications contain the following attestations:

1.  I have reviewed this annual report on Form 10-K of Fitbit, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

152.    The statements referenced above in the 2015 10-K were materially false and misleading because the Company failed to disclose that the Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were wildly inaccurate during moderate to high intensity activities. The 2015 10-K also failed to disclose that a significant portion of Fitbit's revenue during year 2015 was derived from the Company's deceptive marketing and sale of defective product -- the PurePulse Trackers.

153.    On April 13, 2016, the Company filed the 2016 Proxy Statement with the SEC, in which it misrepresented and failed to disclose that Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were wildly inaccurate during moderate to high intensity activities.

154.    Also in all the Form 10-Qs the Company filed with the SEC during the Relevant Period, the Company misrepresented and failed to disclose that a significant portion of Fitbit's revenue was derived from the Company's deceptive marketing and sale of PurePulse Trackers, which were not able to accurately and consistently track users' heart rates, particularly during moderate to high intensity activities. Attached to each such Form 10-Q were Sox certifications signed by Defendants Park and Zerella attesting to the accuracy of the statements made in the respective Form 10-Qs, which were substantially similar to those set forth in ¶ 151.

155.    As a result of the above referenced false and misleading statements, which were made by the Company under the direction of the Individual Defendants and on their watch, the Company has suffered and will continue to suffer substantial damages.

**Securities Class Actions Were Filed Against the Company**

156.    On January 11, 2016, a putative class action lawsuit alleging violations of federal securities laws was filed in the United States District Court for the Northern District of California against the Company, Defendant Park and Defendant Zerella (the "Federal Securities Class Action"). Subsequently, on April 28, 2016 and May 17, 2016, two other securities class actions were filed against the Company and the Individual Defendants in Superior Courts of California, one in San Mateo County and the other in San Francisco County. Upon the Company's request, both state securities class actions were removed to the United States District Court for the Northern District of California. Per a court order signed by Judge Susan Illston on

July 8, 2016, the two state actions were related to the Federal Securities Class Action. However, On July 27, 2016, the District Court remanded the two state securities class actions back to state court.

157.    On July 1, 2016, plaintiffs in the Federal Securities Class Action filed an amended complaint (the "Amended Securities Class Action Complaint"), naming as defendants Fitbit, all of the Individual Defendants, and the Company's underwriters in connection with the IPO. In response, the Fitbit defendants (including Fitbit and the Individual Defendants) filed a motion to dismiss the Amended Securities Class Action Complaint on July 29, 2016. On August 5, 2016, the underwriter defendants filed a motion to dismiss, too.

158.    On October 26, 2016, Judge Illson denied the defendants' motions to dismiss and sustained all the allegations made by the Federal Securities Class Action plaintiffs.

159.    The court's order denying defendants' motions to dismiss, which was made on October 26, 2016 (the "10/26/16 Order"), stated the following, in pertinent part:

I.    **Exchange Act Claims**

***The Court determines that plaintiffs have alleged misstatements in the Amended Complaint which are actionable under securities law.***
…
[P]laintiffs have pointed to numerous statements in which Fitbit claimed that its devices were able to track heart rates and could do so with a high degree of accuracy. Relying on multiple and varying sources, plaintiffs allege that the devices could not do this. Whether the statements were in fact false is not appropriate for resolution on a motion to dismiss. ***At this stage, plaintiffs have sufficiently alleged a material misrepresentation or omission by the defendant.***
…
***Taken together, the allegations in this case are at least as cogent or compelling as a plausible alternative inference, namely that Fitbit executives were simply unaware of the high degree of inaccuracy in PurePulse devices alleged. Particularly given the contributions these devices made to Fitbit's revenue stream in 2015, and the allegations by CW 1 and CW 2, the Court finds that a holistic review of the allegations suffices to establish scienter.***
…

The Amended Complaint alleges, "Over the course of January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was revealed in a lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy" and that as a result, "Fitbit's stock price fell from a high of $30.96 on January 5 to close at $13.99 on May 19," an overall loss of 54.8 percent in value. AC ¶ 13. Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage. See *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Accordingly, **the Court finds that as a pleading matter, plaintiffs have sufficiently alleged loss causation.** The Court therefore DENIES the motion to dismiss plaintiffs' Section 10(b) claim.

…

To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5. Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002)…**As plaintiffs have adequately alleged a primary violation under Section 10(b), defendants' motion to dismiss plaintiffs' claim for control person liability under Section 20 is DENIED.**

## II.   Securities Act Claims

**The Court's above discussion of plaintiffs' allegations of false and misleading statements under Section 10(b) of the Exchange Act applies equally to the Section 11 Securities Act claims, specifically to statements in the IPO Prospectus.** The allegedly false and misleading IPO statements for the Section 11 claim are included among those alleged in plaintiffs' Section 10(b) claims. **Nor do any risk disclosures in the Registration Statement negate this finding…** The Court therefore finds that, **as with the Section 10(b) allegations, the Amended Complaint sufficiently states actionable misrepresentations under Section 11 at this time.**

…

The Court is not persuaded that the cases defendants cite weigh in favor of dismissing plaintiffs' Section 11 claims. For instance, *In re Shoretel* involved an allegation of a corrective disclosure in the form of a press release; however, the press release did not contain the misstatements that plaintiffs had alleged, thereby entitling defendant to dismissal of the claim as a matter of law. *Shoretel*, 2009 WL 248326, at *5. The court in that case contrasted the facts to the situation in *In re Daou*, in which the Ninth Circuit reversed the dismissal of a complaint that "adequately alleged loss causation because the complaint alleged that the market had reacted to disclosure of the misstatements (improper revenue recognition) 'as opposed to merely reacting to reports of the defendant's poor financial health generally.'" Id. (citing *Daou*, 411 F.3d at 1026) (quoting Metzler, 540 F.3d at 1063). **This case more closely mirrors Daou than Shoretel, as plaintiffs have alleged that the market reacted to the filing of the McLellan consumer lawsuit, which revealed the alleged misstatements regarding heart rate tracking accuracy.** Accordingly, defendants' motions to dismiss plaintiffs' Section 11 claim is DENIED.

…

Finally, plaintiffs allege Section 15 claims against defendants Park, Zerella, and Friedman on a "control person" theory of liability. See AC ¶¶ 228-229. *As plaintiffs adequately alleged a primary violation under Section 11 of the Securities Act, defendants' motion to dismiss the claim for control person liability under Section 15 is DENIED.*

(Emphasis added.)

160.    On December 23, 2016, the Fitbit defendants filed a motion for partial reconsideration of the court's 10/26/16 Order, arguing that plaintiffs had failed to sufficiently allege the element of scienter as required to state a claim under Section 10(b) of the Exchange Act. Based on this argument, Fitbit defendants also sought partial reconsideration of the order denying the motion to dismiss plaintiffs' claims under Section 20(a) of the Exchange Act, as plaintiffs failed to prove a primary violation of Section 10(b). On January 19, 2017, the court entered an order denying Fitbit defendants' motion for partial reconsideration (the "1/19/17 Order").

161.    The court's 1/19/17 Order affirmed the court's earlier ruling that the Federal Securities Class Action plaintiffs "have sufficiently alleged the necessary elements to proceed on their claims under the Exchange Act."

### Individual Defendants' Knowledge

162.    The Amended Securities Class Action Complaint included information from several confidential witnesses with knowledge of facts relevant to this action.

163.     The Securities Fraud Class Action Complaint contains testimony from the following confidential witnesses ("CWs"), as edited and summarized in relevant part:

CW1 was a data scientist at Fitbit from November 2014 to December 2015, who was a paid contractor and consultant and was hired specifically to develop quality-assurance analytics for Fitbit's Charge HR, Surge, and other devices.

CW2 was a contract fitness tester at Fitbit from April 2015 until July 2015 and then a Fitness Tester Manager from April 2015 to July 2015. CW2 was allegedly hired primarily

to test the accuracy of Fitbit's heart-rate monitoring devices as Fitbit management was concerned with their accuracy.

CW3 was an executive assistant at Fitbit from January to July 2015.

164.    Based in part on this witness testimony, the Amended Securities Class Action Complaint sufficiently alleged that Fitbit executives were aware of the inaccuracy of the PurePulse Trackers when making false and misleading public statements to shareholders.

165.    For example, the 10/26/16 Order explains:

Here, statements by CW1 and CW2 are sufficient to establish scienter. According to the Amended Complaint, CW1 was a data scientist who was a paid contractor and consultant at Fitbit from November 2014 to December 2015 and who was hired specifically to develop quality assurance analytics for the Charge HR, Surge, and other devices. AC ¶ 164. CW1 presented Fitbit Chief Operations Officer Hansgregory "Hans" C. Hartmann with monthly reports that documented and ranked various types of customer complaints and device failures. *Id.* ¶ 166. By June or July 2015, these monthly reports "noted significant issues with the accuracy of Fitbit's heart-rate monitoring, relative to other types of failures." *Id.* ¶ 167. CW1 also noted that "Fitbit's quality-assurance program consisted largely of a group of athletes who exercised while wearing Fitbit devices and then recorded the results," that the Fitbit office had a dedicated area for this athlete testing, that in June and July 2015 the Fitbit employees who worked with this data "were focused entirely on testing and understanding the inaccuracies in Fitbit's heart-rate monitoring, rather than on other issues," and that defendant Park frequently visited the athlete testing area. *Id.* ¶¶171-74.

Similarly, CW2 was a contract fitness tester at Fitbit from April 2015 until July 2015. *Id.* ¶ 175. CW2 managed and supervised a team of eight to ten fitness testers as they performed various exercises while wearing Fitbit devices and managed the logging of their heart rate results. *Id.* ¶ 177. CW2 ultimately reported to Fitbit Chief Operating Officer Hartmann. *Id.* The Amended Complaint alleges that CW2 "found Fitbit's heart-rate monitoring devices to be highly inaccurate, particularly during vigorous exercise" and that CW2 "reported that the results were often inaccurate for users with either very light or very dark skin tones." *Id.* ¶179.

In addressing the first prong of the CW analysis, both CW1 and CW2 held positions that exposed them directly to data and consumer complaints on the Charge HR and Surge, establishing their reliability and personal knowledge of the alleged inaccuracies. Second, both CW1 and CW2 reported directly to COO Hartmann, indicating scienter by Fitbit executives. These confidential witness statements suffice to plead scienter.

54

166.    In addition, the testimony of the confidential witnesses showed that, at least, Defendants Park and Zerella had knowledge of the inaccuracies and intentionally breached their fiduciary duties. According to the Amended Securities Class Action Complaint, CW3 noted that "Hartmann attended weekly executive staff meetings with Defendants Park and Zerella, where much of the Company's business and decision-making was done." CW3's testimony collaborated CW1's belief that "Hartmann had provided CW1's findings and recommendations to members of the Company's executive team."

**<u>Summary of the Individual Defendants' Wrongful Conduct</u>**

167.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the above-alleged internal control failures, and caused or allowed the illicit activity described herein (which ultimately led the Company to become the subject of the various litigation set forth herein), and willfully or recklessly caused or permitted the Company to make false and misleading statements and omissions of material fact in the Company's SEC filings and press releases.

168.    Specifically, the Individual Defendants have willfully or recklessly caused the Company to deceptively market the PurePulse Trackers and to conceal material information concerning the accuracy of Fitbit's heart rate tracking. Despite being aware of the truth at all times during the Relevant Period, Individual Defendants failed to take any actions to halt the marketing, sale, and distribution of the defective products, and thus exposed the Company to a great amount of liabilities and potential liabilities.

169.    The Individual Defendants caused the Company to request an early release from the Lock-Up Agreements exclusively for its employees and consultants, which enabled many of them to engage in lucrative insider sales and to receive benefits that were not equally shared by

non-insider shareholders who held Company stock before the IPO and continued to hold it when the Lock-Up Agreements released Company employees and consultants.

170.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that falsely stated and/or failed to disclose that: (i) Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were particularly inaccurate during moderate to high intensity activities; (ii) the heart rate error for PurePulse Trackers could be so great that it posed serious health risks to users; and (iii) a significant portion of Fitbit's revenue was derived from the Company's deceptive marketing and sale of PurePulse Trackers.

171.    Additionally, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

## DAMAGES TO FITBIT

172.    As a direct and proximate result of the Individual Defendants' conduct, Fitbit will lose and expend many millions of dollars.

173.    Such expenditures include, but are not limited to, legal fees and potential payments made that are associated with the Consolidated Consumer Class Action and the Securities Class Actions, amounts paid to outside lawyers, accountants, and investigators in connection to these actions.

174.    Such costs include, but are not limited to, the $4.0 million that the Company announced it anticipated would be the cost of reorganization, including the termination of 6% of the Company's global workforce, 110 employees.

175.    Such costs also include compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

176.    Such losses also include losses of revenues caused by customers' loss of trust in the Company's business and products.

177.    As a direct and proximate result of the Individual Defendants' conduct, Fitbit has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

178.    Plaintiff brings this action derivatively and for the benefit of Fitbit to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fitbit and unjust enrichment, as well as the aiding and abetting thereof.

179.    Fitbit is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180.    Plaintiff is, and has been since the beginning of the Relevant Period, a Fitbit shareholder. Plaintiff will adequately and fairly represent the interests of Fitbit in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

181.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein. A pre-suit demand on the Board of Fitbit is futile and, therefore, excused.

182.    At the time of filing of this action, the Board consists of the following seven (7) directors: Individual Defendants Park, Callaghan, Friedman, Murray and Paisley (collectively, the "Defendant Directors"), and non-parties Laura Alber ("Alber") and Glenda Flanagan ("Flanagan") (together with the "Defendant Directors," the "Directors"). Plaintiff need only allege demand futility as to four of the seven Directors that are on the Board at the time this action commenced.

183.    Demand on the Board is excused because the five Defendant Directors -- who comprise a majority of the Board -- were all named as defendants in the Securities Class Actions. As the court has sustained the allegations raised in the Federal Securities Class Action to allow the action to proceed, each of the Defendant Directors faces, individually and collectively, a substantial likelihood of liability as a result of their engagement, either knowingly or recklessly, in schemes to make false and misleading statements and omissions of material fact while four of them engaged in insider sales based on material non-public information.  Each of the Defendant Directors also faces a substantial likelihood of liability for concealing material information concerning the accuracy of the Company's heart rate tracking from consumers and the general public, and for failing to take any actions to halt the marketing, sale, and distribution of the defective products.   Thus the Defendant Directors are unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

184.    As alleged above, a majority of the directors on the Board (Defendants Park, Friedman, Murray, and Callaghan) engaged in lucrative insider sales during the Relevant Period. These Directors were interested and face a substantial likelihood of personal liability as a result of the illicit insider sales.

185.    Notably, these four directors were able to participate in the Secondary Offering and execute the November 18, 2015 sales only because the Lock-Up Agreements were released prior to its expiration date upon the request of the Company. By approving the request for an early release of the Lock-Up Agreements and authorizing the Secondary Offering, the Board created an opportunity to benefit themselves to the exclusion of non-insider pre-IPO shareholders. In particular, with the consent of the Company's underwriter, Fitbit's Board restructured the lock-up restrictions to allow only Fitbit's employees and consultants an opportunity to sell up to 2.3 million shares one month prior to the scheduled expiration date of the Lock-Up Agreements. Four of the five directors who approved the early release (Defendants Park, Friedman, Callaghan, Murray, and Paisley) took the chance to engage in lucrative insider sales at an artificially inflated price. Because these directors stood to profit from the early release to the exclusion of the non-insider pre-IPO shareholders, the entire fairness standard should apply in determination of the demand futility.

186.    Additional reasons that demand on Defendant Park is futile follow.  Defendant Park is the Company's Chief Executive Officer, President and Chairman of the Board, and is thus, as the Company acknowledges, a non-independent director. Indeed, he receives many millions of dollars in compensation from the Company annually; for the fiscal year 2014, Defendant Park received $7,835,088 in compensation from the Company; for the fiscal year 2015, he received $1,905,840 in compensation from the Company. Defendant Park was ultimately responsible for all of the wrongful conduct described herein, including the deceptive marketing, the Company's operations and internal controls, all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, all of which he signed, and including many of which he personally made. Additionally,

59

Defendant Park had approved the decision to request an early release from the Lock-Up Agreements exclusively for employees and consultants and benefitted enormously by engaging in insider sales at artificially inflated prices.  His insider sales before the fraud was exposed, which yielded over $83 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Park is a defendant in the Securities Class Actions. Defendant Park conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Park breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.   Additional reasons that demand on Defendant Friedman is futile follow. Defendant Friedman is the Company's Chief Technology Officer and Co-founder, and is, as the Company acknowledges, a non-independent director. Indeed, he receives many millions of dollars in compensation from the Company annually; for the fiscal year 2014, Defendant Friedman received $7,835,088 in compensation from the Company; for the fiscal year 2015, he received $702,340 in compensation from the Company. Defendant Friedman was ultimately responsible for the wrongful conduct described herein, including the deceptive marketing, the Company's operations and internal controls, the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, many of which he signed or approved. Additionally, Defendant Friedman had approved the decision to request an early release from the Lock-Up Agreements exclusively for employees and consultants and

benefitted enormously by engaging in insider sales at artificially inflated prices.  His insider sales before the fraud was exposed, which yielded approximately $52 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Friedman is a defendant in the Securities Class Actions. Defendant Friedman conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Friedman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Murray is futile follow. As the Chair of the Nominating and Governance Committee and a member of the Audit Committee, he was responsible for, among other things, overseeing the process of evaluating the performance of Board members, advising the Board on corporate governance matters, reviewing the Company's public financial reports, reviewing and accessing the Company's internal controls procedures, and ensuring the Company's compliance with legal and regulatory requirements, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2015 10-K. Defendant Murray's large Company stock holding, worth about $108.2 million, reveals his interest in keeping the Company's Class A stock price as high as possible. Additionally, Defendant Murray had approved the decision to request an early release from the Lock-Up Agreements exclusively for employees and consultants and benefitted enormously by engaging in insider sales at artificially inflated prices.  His insider sales

before the fraud was exposed, which yielded approximately $50 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Importantly, Defendant Murray is not independent also because he was involved in a related party transaction with the Company. Defendant Murray is the managing member of SB PV GP LLC, an entity affiliated with SoftBank PrinceVille Investments, L.P., an entity that holds more than 5% of the Company's outstanding capital stock. In 2015, in connection with a distribution agreement, the Company entered into a transaction with SoftBank BB Corporation, or SoftBank BB, an entity affiliated with SoftBank PrinceVille Investments, such that the Company repaid SoftBank BB $3.1 million for sales returns accepted in 2014, and SoftBank BB paid the Company $0.5 million, due to an amendment of the distribution agreement. Moreover, Defendant Murray is a defendant in the Securities Class Actions. Considering all the above reasons, Defendant Murray would not be able to impartially consider a demand. Thus, for these reasons, too, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.   Additional reasons that demand on Defendant Callaghan is futile follow. As the Chairman of the Compensation Committee and a member of the Nominating and Governance Committee, Defendant Callaghan was charged with evaluating the performance of the Company's executives and overseeing the process of evaluating the performance of Board members, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2015 10-K. Defendant Callaghan's Class A Company stock holding, worth over $6 million, reveals his interest in keeping the Company's stock price as high as possible. Additionally, Defendant Callaghan had

approved the decision to request an early release from the Lock-Up Agreements exclusively for employees and consultants and benefitted enormously by engaging in insider sales at artificially inflated prices.  His insider sales before the fraud was exposed, which yielded approximately $196 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Callaghan is a defendant in the Securities Class Actions. Defendant Callaghan conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Callaghan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Paisley is futile follow. As the Chair of the Audit Committee and a member of the Compensation Committee, Defendant Paisley was charged with, among other things, reviewing the Company's public financial reports, reviewing and accessing the Company's internal controls procedures, evaluating the performance of the Company's executives, and ensuring the Company's compliance with legal and regulatory requirements, and his failure to properly do so make him especially culpable for the wrongful conduct described herein.  Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2015 10-K. Additionally, Defendant Paisley had approved the decision to request an early release from the Lock-Up Agreements exclusively for employees and consultants and thus enabled a majority of the Board to enormously benefit themselves by engaging in insider sales at artificially inflated prices.

Moreover, Defendant Paisley is a defendant in the Securities Class Actions. Considering all of the above reasons, Defendant Paisley would not be able to impartially consider a demand. Thus, for these reasons, too, Defendant Paisley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to Fitbit's standards of business conduct. The Defendant Directors did not comply with the requirements of the Code of Conduct. The Defendant Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Defendant Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

192.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

193.    Fitbit has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Fitbit any part of the damages Fitbit suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

194.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Defendant Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a vast majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

195.    The acts complained of herein constitute violations of fiduciary duties owed by Fitbit's officers and directors, and these acts are incapable of ratification.

196.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fitbit. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Fitbit, there would be no directors' and officers' insurance protection.

Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Defendant Directors is futile and, therefore, excused.

197.    If there is no directors' and officers' liability insurance, then the Defendant Directors will not cause Fitbit to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

198.    Thus, for all of the reasons set forth above, all of the Defendant Directors cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

202.    The 2016 Proxy failed to disclose that, under the direction and watch of the Directors: (i) Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were particularly inaccurate during moderate to high intensity activities; (ii) in fact, the heart rate error for PurePulse Trackers could be so great that it posed serious health risks to users; and (iii) a significant portion of Fitbit's revenue was derived from the Company's deceptive marketing and sale of PurePulse Trackers.

203.    The Individual Defendants also caused the 2016 Proxy to be false and misleading in that they stated that the division of responsibilities with regard to the Board's role in risk oversight constitutes "an effective approach" for addressing the risks the Company faces. Indeed, due to the Individual Defendants' conduct with respect to the deceptive sale, marketing, distribution of the defective PurePulse Trackers, and dissemination of the materially false and misleading statements, the Individual Defendants failed to practice and/or uphold sound corporate governance practices.

204.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the 2016 Proxy, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

205.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fitbit's business and affairs.

208.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Fitbit.

209.    In breach of their fiduciary duties owed to Fitbit, the Individual Defendants willfully or recklessly caused the Company to be the subject of various litigation referenced herein by causing the Company to deceptively market the PurePulse Trackers, to conceal material information concerning the accuracy of its heart rate tracking technology from the consumers and the general public, and to fail to take any actions to halt the marketing, sale, and distribution of the defective products, and thus exposed unknowing users to health risks, and by falsely stating and/or failing to disclose to the investing public that under the Individual

Defendants' direction and on their watch: (i) Fitbit PurePulse Trackers were not consistently accurate in heart rate monitoring and were particularly inaccurate during moderate to high intensity activities; (ii) the heart rate error for PurePulse Trackers could be so great that it posed serious health risks to users; and (iii) a significant portion of Fitbit's revenue was derived from the Company's deceptive marketing and sale of PurePulse Trackers.

210.    In further breach of their fiduciary duties owed to Fitbit, the Individual Defendants caused the Company to request an early release from the Lock-Up Agreements exclusively for the benefit of its employees and consultants, which enabled many of them to engage in lucrative insider sales and to receive benefits that were not equally shared by non-insider shareholders.

211.    Also in breach of their fiduciary duties owed to Fitbit, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

212.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fitbit's securities.

213.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail

to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.

214.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fitbit has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216.   Plaintiff on behalf of Fitbit has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

217.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fitbit.

219.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, including in the Company's public offerings, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fitbit that was tied to the performance or

artificially inflated valuation of Fitbit, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

220.    Plaintiff, as a shareholder and a representative of Fitbit, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from over-compensation, insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

221.    Plaintiff on behalf of Fitbit has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fitbit, for which they are legally responsible. As a direct and proximate result of the Individual Defendants' abuse of control, Fitbit has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Fitbit has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

224.    Plaintiff on behalf of Fitbit has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

225.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fitbit in a manner consistent with the operations of a publicly-held corporation.

227.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fitbit has sustained and will continue to sustain significant damages.

228.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

229.   Plaintiff, on behalf of Fitbit, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

230.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fitbit to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets due to loss of investors and customers who no longer trust the Company.

232.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

233.    Plaintiff on behalf of Fitbit has no adequate remedy at law.

**REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Fitbit, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fitbit;

(c)    Determining and awarding to Fitbit the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Fitbit and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fitbit and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

73

2.      a provision to permit the shareholders of Fitbit to nominate at least four candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Fitbit restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 2, 2017

Of Counsel:

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
(516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*